IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Jill Uhlir,                      )
                                 )
             Plaintiff,          )
                                 )
                                 )   18 C 3215
          v.                     )
                                 )
   City of Wheaton,              )
                                 )
          Defendant.             )


**MEMORANDUM OPINION AND ORDER**

Plaintiff Jill Uhlir sues the City of Wheaton, Illinois ("the City"), alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), and the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §§ 621 *et seq*. Uhlir, an officer of the Wheaton Police Department ("WPD"), claims that the City discriminated against her on the basis of her sex and her age by declining to promote her to the rank of sergeant. The City seeks summary judgment as to both of Uhlir's claims. For the reasons discussed below, the motion is granted.

I.

Uhlir began working for the WPD as a patrol officer in 1998. Beginning in 2010 or 2011, she was permitted to act as an Officer in Charge ("OIC"), a position in which an officer performs the basic duties of a sergeant when a shift's primary sergeant is not

present. In 2011, Uhlir applied for promotion to the rank of sergeant. Participants in the WPD's promotional process are required to undergo a series of tests, and those who pass are placed on an eligibility list for a two-year period. When a position becomes available, the WPD's Chief of Police selects individuals from the list to serve for one year as a probationary sergeant. If the candidate performs satisfactorily during that period, her or she is promoted to the rank of sergeant.

Uhlir applied for the sergeant position in 2011, 2013, and 2015. Each time, she earned a spot on the eligibility list. She was not selected in 2011 (no candidates were selected that year) or in 2013 (two other candidates were selected). In 2015, however, she and another officer, Brian Gabryel, were chosen from a list of four candidates. Uhlir was selected by James Volpe, who had become the City's Police Chief in November 2015. Uhlir was the first female in the WPD's history to be promoted to probationary sergeant. As of the events at issue here, the WPD had never had a female sergeant, lieutenant, deputy chief, or chief.[1]

Uhlir's probationary period began in February 2016, and her performance was assessed on a quarterly basis. Lieutenant Bill

---

[1] At least one female officer, Angela Smith, was promoted to probationary sergeant after Uhlir's demotion. *See, e.g.*, Uhlir Dep. at 299:20-21. However, it is unclear from the record whether Smith's probationary period has ended, and if so, whether she was promoted to sergeant.

Cooley supervised Uhlir for the first two quarters; Lieutenant Tom Heidank supervised her for the second two quarters. Cooley and Heidank prepared quarterly evaluation memos assessing Uhlir's performance in five key areas: Teamwork; Job Knowledge; Communication; Accountability/Responsibility; and Leadership Capability. Uhlir's quarterly evaluations were reviewed with her and signed by her.

Each of Uhlir's evaluations noted a number of deficiencies in her performance. Although she received an "Exceeded Standards" rating in the Teamwork category, and a "Meets Standards" rating in the Accountability/Responsibility category, Uhlir received a "Needs Improvement" rating in the categories of Job Knowledge, Communication, and Leadership Capability. *See* Uhlir Dep. Ex. 11 at PLT712. Although the problems identified in her evaluations varied in severity, a number of them were regarded as serious.

In December 2016, Cooley and Heidank summarized their quarterly evaluations in a joint memo ("the Summary Memo"), which recommended that Uhlir's probationary period "be terminated unsatisfactorily." *Id*. at PLT721. The following is a summary of the performance issues highlighted in the memos.

**First Quarter**

- On February 7, 2016, Uhlir and three other officers responded to a home invasion call. Because the dispatcher gave them the incorrect address, they initially arrived at the wrong home. After discovering the mistake, the other officers proceeded to the correct address, but Uhlir stayed behind

3

briefly to smooth things over with the homeowner. Following the incident, Cooley told Uhlir that she should have gone to the correct address immediately with the other officers, explaining that since four suspects were believed to have been involved in the home invasion, the officers were at a numerical disadvantage without her.

- On March 20, 2016, Uhlir responded to a call involving an apparently mentally ill individual at a convenience store who had stated that he wanted to hurt someone. Although the dispatcher had sent officers to provide backup assistance, Uhlir called them off and confronted the person alone. After the incident, Cooley told Uhlir that she should not have called off the backup and that handling the situation with other officers would have been safer than handling it alone.

- On April 28, 2016, another WPD officer, Michael Schumaker, complained that Uhlir had made disparaging remarks about him during the morning roll call. According to Schumaker, another officer told him that Uhlir had commented that she found Schumaker disgusting because of his excessive sweating. Cooley discussed the matter with Uhlir and reported that she "took full responsibility for her actions and apologized to the officer," adding that she "was accepting of the coaching and maintained a positive attitude." Uhlir Dep. Ex. 11 at 162.

- Cooley observed that Uhlir's "critical incident reviews" had been returned multiple times for corrections and had not been submitted in a timely fashion. He cites one review relating to an incident that occurred on February 22, 2016, but was not submitted until April 14, 2016, despite several reminders. *Id*.

**Second Quarter**

- On May 15, 2016, Uhlir instructed an officer to terminate his pursuit of a suspect. Cooley stated that Uhlir's decision was ultimately correct but that she made the decision before having all of the necessary information. He coached Uhlir on "the need to ascertain the facts/circumstances of an incident prior to making a command decision." *Id*. at 178.

- After a retail theft incident on July 5, 2016, several suspects were taken to a hospital in Naperville, Illinois. Uhlir opted not to send an officer to the hospital to investigate. Cooley told Uhlir that she should have sent an

4

officer to interview the suspects because it would have obviated the need for a lengthy follow-up investigation. The memo notes that Uhlir disagreed with Cooley and maintained that her decision was correct.

- On August 6, 2016, Uhlir responded to a call involving a man with a gun at a location on Roosevelt Road (the "Roosevelt Road incident"). Uhlir responded to the scene without ammunition in her rifle. She also deployed the rifle with its chamber blocking device ("CBD") engaged, making it impossible to use the weapon even if it had been loaded. In addition, Cooley stated that Uhlir had set up the command post in the "kill zone" (i.e., an area close enough to the shooter to create a danger of being shot). Uhlir received a letter of reprimand as a result of the incident and was required to undergo additional rifle training. Cooley reported that Uhlir's handling of the incident had "caused officers to verbally express concern to staff members of her decision making, tactical knowledge and ability to command a tactical scene," and that "[s]he must demonstrate significant improvement in this area if she has a desire to maintain credibility amongst her subordinates." *Id*. at 180.

- Several of Uhlir's reports and annual evaluations were returned to her multiple times for corrections.

- Uhlir was coached for attending unnecessary court appearances (e.g., status calls). She was also coached because her time cards indicated "pyramiding" -- i.e., seeking overtime pay both for working more than eight hours per day and more than forty hours per week.

**Third Quarter**

- On August 25 and 26, 2016, Uhlir attended two days of additional rifle training as a result of the Roosevelt Road incident. Her trainer, Sergeant P.J. Youker, stated that at the beginning of the session, Uhlir "had a high level of anxiety and a poor understanding of the basic mechanics of firearms and the CBD in general." *Id*. at 218; *see also* Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 45. In addition, Uhlir accidentally fired her weapon into the ground during the training. Pl.'s Resp. to Def.'s L.R. 56.1 Stmt. ¶ 47.

- On September 22, 2016, Uhlir reported to an assignment without realizing that she had left her service weapon at home. As a result, she was issued a letter of reprimand and

given a one-day suspension.

- On October 12, 2016, the WPD received a call from a neighboring police department about a possible "road rage" incident in grocery store parking lot. Instead of sending officers to the offender's location, she directed them to set up a block away and await further information. Heidank told Uhlir that officers should have been sent directly to the offender's location so that they could observe the situation directly.

- Uhlir failed to provide training opportunities for a Field Training Officer during the months of September and October. As a result, the officer fell behind in his training program.

- Heidank concluded the evaluation by stating: "Sergeant Uhlir has had two weapon related violations within the last two quarters which should not have happened and cannot repeat themselves. Sergeant Uhlir's decision not to have her officer's [sic] respond to a man with a gun call and having another weapon violation this quarter has a great impact on her credibility with her subordinates." Uhlir Dep. Ex. 11 at 214.

**Fourth Quarter**

- On November 6, 2016, a neighboring police department was pursuing an individual on foot who was believed to be in possession of a gun. The chase was heading toward Wheaton's eastern border. Uhlir wanted to contact the neighboring department before sending WPD officers to assist. Heidank told Uhlir that WPD officers should have been sent to help immediately.

- On November 10, 2016, Uhlir responded to a domestic dispute. According to Heidank, Uhlir "failed to set the Command Post from the view of the target location" and "then failed to take any further steps to Command the police activities." *Id*. at 231. Heidank further comments that during a subsequent debriefing, Uhlir stated that "she felt like there was nothing for her to do as other Command Personnel where on the scene and had already taken control of the perimeter and negotiations." *Id*. at 231-32. Heidank opined: "This statement ultimately shows that Sergeant Uhlir does not understand the overall importance of scene management." *Id*. at 232.

- On November 14, 2016, Uhlir attended a WPD Warrant Team training session. The topics covered included the "proper deployment and handling of the AR 15 rifle and search warrant tactics." *Id*. Sergeant Ryan Conway sent Heidank a memo stating "that Sergeant Uhlir does not appear knowledgeable on what or how to differentiate between various tactical scenes." *Id*.

Uhlir's evaluations were not entirely negative. All of the evaluations stated that she worked well with others in the department and showed flexibility regarding her work schedule. Some of the evaluations also cited her community involvement, *See, e.g.*, Uhlir Dep. Ex. 11 at 178 (noting that Uhlir "continues to demonstrate a desire to work with elders within the community"); *id*. at 231 (noting that Uhlir had "received a positive note from the Auxiliary Police Unit stating that she was very helpful and cooperative during the Turkey Trot Fun Run on November 24, 2016," and that she was appointed for a two-year term to the Illinois Department on Aging's "Fatality Review Team"). The memos also included mention of tasks that Uhlir had handled particularly well. *See id*. at 178 ("On June 1, 2016, Sergeant Uhlir was provided a task by Lieutenant Heidank. A local apartment complex was repaving the entire parking facility which required nearly 300 vehicles to relocate within the city. Sergeant Uhlir took time to work with property management to resolve this issue without incident."). Nevertheless, it is clear that the lieutenants' overall evaluation of Uhlir's performance was decidedly negative.

7

Cooley and Heidank forwarded the Summary Memo to Deputy Police
Chief Don Wilson, along with police reports and other documents
relating to the incidents discussed in their evaluations. Wilson
solicited additional input from three WPD sergeants -- Ryan Conway,
Robert Lewis, and Karl Dillenkoffer. Each of these sergeants
prepared memos expressing concern about Uhlir's ability to perform
the duties required of a sergeant. Based on the lieutenants'
Summary Memo and the sergeants' supplemental memos, Wilson
prepared his own memo to Police Chief Volpe recommending that Uhlir
not be promoted to sergeant. *Id*. at 156. Based on the materials he
had received from Wilson, Volpe in turn sent a memo and supporting
documentation to Wheaton's City Manager, Mike Dzugan, recommending
that Uhlir be demoted to her former pay grade and rank. On December
29, 2016, Dzugan accepted Volpe's recommendation and Uhlir was
demoted. At the time, she was forty-five years old.

## II.

"Summary judgment is proper when the 'pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law.'" *Tegtmeier v. Midwest Operating
Engineers Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004)
(quoting Fed. R. Civ. P. 56(c)). In deciding the City's motion, I
must view the record in the light most favorable to Uhlir as the

nonmoving party. *See, e.g., Johnson v. Rimmer*, 936 F.3d 695, 706
(7th Cir. 2019).

Title VII "makes it unlawful for an employer to discharge an
employee because of that person's sex," *Swyear v. Fare Foods Corp.*,
911 F.3d 874, 883 (7th Cir. 2018), and the ADEA "protects workers
40 years of age and older from age-based employment
discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450,
454 (7th Cir. 2018) (quoting 29 U.S.C. § 623(a)(1)). These claims
can be addressed in tandem because "the same analytical framework
[applies] to employment discrimination cases whether they are
brought under the ADEA or Title VII." *Nagle v. Vill. of Calumet
Park*, 554 F.3d 1106, 1114 & n.3 (7th Cir. 2009).

The parties agree that the question at this juncture "'is
simply whether the evidence,' considered as a whole, 'would permit
a reasonable factfinder to conclude that the plaintiff's race,
ethnicity, sex, religion, or other proscribed factor caused the
discharge or other adverse employment action.'" *Abrego v. Wilkie*,
907 F.3d 1004, 1012 (7th Cir. 2018) (quoting *Ortiz v. Werner
Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). *Ortiz*
clarified that to raise an inference of discrimination, a plaintiff
is not required to invoke the burden-shifting framework of
*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), but may do
so as "a means of organizing, presenting, and assessing
circumstantial evidence in frequently recurring factual patterns

found in discrimination cases." *David v. Bd. of Trustees of Cmty.*
*Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Here, the
parties dispute whether Uhlir has established two of the four
elements of a prima facie case under *McDonnell Douglas*, namely
whether she was meeting her employer's legitimate expectations and
whether she was treated differently than similarly situated male
employees younger than she. As Uhlir observes, these two analytical
prongs sometimes "merge." *Pantoja v. American NTN Bearing MFG*
*Corp.*, 495 F.3d 840, 846 (7th Cir. 2007).

Whether considered separately or in conjunction, however,
Uhlir fails to establish these elements. The City's stated reason
for her demotion was poor performance, i.e., that she was not
meeting the WPD's legitimate expectations. Uhlir points to four
male officers under the age of forty--Brian Gabryel, Daniel
Salzmann, and Gregory Klos--and argues that their promotion to
sergeant raises an inference that her demotion was discriminatory.
But she offers no factual basis from which to conclude that these
individuals were similarly situated to her in all material
respects. "All things being equal, if an employer takes an action
against one employee in a protected class but not another outside
that class, one can infer discrimination. The 'similarly situated'
prong establishes whether all things are in fact equal." *Filar v.*
*Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir.
2008) (citation omitted). Given the stated basis for Uhlir's

demotion, common sense dictates that she must offer at least *some*
evidence of her comparators' performance to eliminate their
superior performance as a "possible explanatory variable[]" and
"isolate the critical independent variable—discriminatory animus."
*McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th
Cir. 2019) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th
Cir. 2012) (internal quotation marks and citation omitted).

Uhlir has not done this. In fact, the record contains nothing
at all about Gabryel's or Salzmann's performance. And while Uhlir
observes that Officer Klos was disciplined on one occasion for
accidentally discharging his weapon in the police station's
parking lot, that incident occurred in 2015, well before Klos's
probationary period. *See* Volpe Dep. at 139:24-140:1.

By contrast, the record of Uhlir's performance is replete
with evidence of a wide variety of concerns her evaluators
expressed over the course of her probationary period, one of which
was serious enough to warrant a letter of reprimand and one-day
suspension, and another of which required her to undergo additional
training. Uhlir urges me not to consider any of this evidence on
the ground that it is hearsay and reflects facts not within the
personal knowledge of Cooley, Heidank, Wilson, Volpe, or Dzugan.
*See* Resp. Br. at 13-14. But this objection is without merit.

To begin, employers are not required to base employment
decisions on evidence that would satisfy the Federal Rules of

Evidence. *See Waters v. Churchill*, 511 U.S. 661, 676 (1994) (noting that employers "often do rely on hearsay, on past similar conduct, on the personal knowledge of people's credibility, and on other factors that the judicial process ignores" and may have legitimate reasons to do so). My role is not to "sit as a superpersonnel department" and reexamine the evidence of Uhlir's performance to determine if it justified the City's decision to demote her. *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). Indeed, my review of the record does not seek to determine whether the WPD's concerns about Uhlir's performance were well-founded, but only whether the City's stated reason for her demotion was the true reason. *See id*. Employee performance records are routinely deemed admissible evidence of the state of mind of the decision maker(s). *See, e.g.*, *Luckie v. Ameritech Corp*., 389 F.3d 708, 715–16 (7th Cir. 2004); *Downing v. Abbott Labs*., No. 15 C 05921, 2019 WL 4213229, at *3 (N.D. Ill. Sept. 5, 2019); *O'Leary v. Accretive Health, Inc*., No. CIV.A. 09 C 1428, 2010 WL 234869, at *2 n.3 (N.D. Ill. Jan. 19, 2010).

At all events, Uhlir admits the factual underpinnings of most of the events on which her performance evaluations were based. Her subjective belief that her conduct in those instances was appropriate does not, without more, suggest that her supervisors' contrary view was discriminatory. *See, e.g.*, *Millbrook v. IBP, Inc*., 280 F.3d 1169, 1181 (7th Cir. 2002) ("[A] plaintiff's own

12

opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions.") (quotation marks omitted); *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 602 (7th Cir. 2001) (same). Nor does the fact that Dzugan--the ultimate decision maker--relied on his police chief, deputy police chief, and lieutenants to assess Uhlir's fitness for the role of sergeant and based his decision on their recommendation without conducting an independent review of her qualifications suggest that the reason the City gave for her demotion was pretextual.

It is true that the dearth of women forty and older in leadership roles at the WPD raises an eyebrow. Indeed, it is possible that male probationary sergeants make missteps of the kind Uhlir was faulted for making, yet their mistakes are overlooked by the coterie of male colleagues and supervisors at the WPD. The problem is that Uhlir "must do more than simply show that there is some metaphysical doubt" about the genuineness of the City's stated reason for her demotion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). At oral argument on the City's motion, Uhlir's attorney speculated that the fact that her performance records comprise over a hundred pages of documents, while her comparators' performance reports contain just a handful of pages and identify no mistakes, indicates that

she was scrutinized more closely than they because of her sex.[2]
*See* Tr. of 12/05/2019 Hr'g at 2-3. But even assuming that counsel's
representation about the comparators' performance records is
correct, Uhlir must do more than merely speculate that they made
errors similar to hers during their probationary periods. *See*
*McDaniel*, 940 F.3d at 369 (plaintiff's speculation that
comparators were younger than he did not satisfy similarly-
situated inquiry); *Skiba v. Illinois Cent. R.R. Co.,* 884 F.3d 708,
723 (7th Cir. 2018) (comparator evidence consisting "solely of a
table listing the names and ages of the thirty-seven younger
employees and the positions for which they were hired" lacked
sufficient "amplifying detail of the employees' qualifications or
employment history" to raise an inference of discrimination). Yet
the record contains no evidence of this sort.[3]

### III.

Regardless of whether the inquiry proceeds under *Ortiz* or
under *McDonnell Douglas*, Uhlir has not come forward with the type

---

[2] Counsel indicated that Uhlir does not assert this theory in
connection with her age discrimination claim. *See* Hr'g Tr. at 26.
[3] In addition to her comparator evidence, Uhlir points to evidence
of a harassment complaint filed by a female colleague against
Heidank and a male sergeant in April of 2016; to her own complaint
to a previous deputy chief that Cooley had evaluated her unfairly
prior to her probationary period, and the fact that she returned
to her previous role after her demotion; and to a December 2016
conversation between Volpe and another officer "regarding negative
treatment of females at the department." None of this evidence
would support a jury verdict in Uhlir's favor on the claims she
asserts.

of evidence that would allow a reasonable jury to conclude that she was demoted because of her sex or her age, rather than because of her performance. Accordingly, the City's motion for summary judgment is granted.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge


Dated: December 13, 2019